IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| Elizabeth Valenti, | : | Civil Action No. 08-912 (PGS) |
| Plaintiff, | : |  |
| v. | : | OPINION |
| COMMISSIONER OF SOCIAL SECURITY, | : |  |
| Defendant. | : |  |

This matter comes before the Court pursuant to Titles II and XVI of the Social Security Act, 42 U.S.C. § 301, *et seq.*   Plaintiff Elizabeth Valenti ("Plaintiff") seeks review of the Defendant, Commissioner of Social Security Administration's ("Defendant") final decision denying her claim for Disability Insurance Benefits (DIB).   In this case, Plaintiff alleged disability as of August 9, 2002 due to hypertension, a thyroid disorder, and exhaustion (R. 64, 76). She also later alleged a psychiatric impairment (R. 34).   On August 18, 2004, ALJ Richard Desteno found that Plaintiff had the residual functional capacity to do her past work as a secretary/receptionist (Original Hearing) (R. 21).   Plaintiff appealed.

On June 17, 2005, Judge Hayden of the United States District Court found that the administrative decision of ALJ Desteno was not supported by substantial evidence, and remanded the case requiring the ALJ to 1) order a consultative examination for the purpose of psychological, cognitive and intelligence testing of the Plaintiff; 2) consider all psychiatric evidence including the assessment of Plaintiff's Global Functioning as estimated by her treating psychologist and the

1

support staff at Trinitas Hospital; 3) engage in a full discussion of the medical evidence in the context of any finding; and 4) arrange testimony of a vocational expert. On remand, ALJ Desteno held another hearing (Remand Hearing) on October 5, 2006. The Remand Hearing was conducted and limited to the items Judge Hayden requested. In order to analyze the case, the facts from the both the Original and Remand Hearings were considered herein[1].   With regard to the Remand Hearing, Plaintiff is primarily upset by the "ALJ's automatic denial on remand." At the Remand Hearing, a vocational expert, Rocco Meolo found Plaintiff capable of performing medium work that involves no more than simple repetitive tasks  (R. 281-82). Because Plaintiffs residual functional capacity was consistent with her past relevant job as a packer of baked goods in a supermarket, the ALJ found that Plaintiff could perform same (R. 282).

Background

Plaintiff is a 61 year old woman born in Brooklyn, New York on October 7, 1948.  She endures hypothyroidism, an enlarged thyroid goiter, hypertension and fatigue (R. 21, 52). She is a high school graduate of a vocational high school where she studied drafting and blueprint reading (R. 97). Her work history includes working from 1996 to 2001 at Shopper's World, a clothing retailer, as a receptionist for the owner.   Her work included answering the telephone, inputting information on the computer, taking messages and arranging meetings (R. 28-30). She stated that the job required her to move about during the day, but she was not required to do any lifting (R. 29). She would sit for approximately six hours a day, and walk and stand for about an hour (R. 112).

---

[1]     Plaintiff reapplied for benefits in January, 2006 and was found to be disabled as of May 16, 2005. Thus, the only issue for the court to consider is whether substantial evidence supports the ALJ's finding that Plaintiff retained the residual functional capacity to perform her past relevant work from August 9, 2002 through May 16, 2005.

She also worked at the Hydro Group between 1990 through 1993 as a secretary/receptionist. Prior to that, she worked at Weston Instruments for about 21 years where she assisted the draftsmen and engineers with blueprints and performed secretarial work (R. 31, 89). Plaintiff stopped working at Shopper's World when her mother became terminally ill, and she became her mother's caretaker. While caretaking, Plaintiff worked part-time at the Pathmark Supermarket; but quit when her mother was too ill to be left unattended. She cared for her mother for about seven months prior to her death on August 6, 2002 (R. 32).

In October, 2002, Plaintiff's treating physician found that she was unable to work for several months due to emotional and physical fatigue from caring for her mother prior to her death (R. 134). She was unable to work due to a lack of energy which Plaintiff believed was linked to depression.

Plaintiff lives alone in an apartment. She drives and sometimes picks up her mentally disabled sister for the weekend (R. 36, 119). She testified that she does not socialize and is exhausted most of the time. According to Plaintiff, she also has some pain in her arm and lower back which lasts a day or two. She is stiff when sitting, and is weak when standing (R. 38). In order to grocery shop, she either walks the three blocks or drives. If she walks, she does not carry the bags home, but pushes them home in a cart (R. 38-39, 121, 137). During the day she watches television and does household chores (unless she is over tired). Plaintiff can perform household chores for about a half hour, but then must rest (R. 43). She prepares simple meals for herself, showers and dresses herself (R. 120, 123, 137). She testified that often she "sits it out" when she is feeling physically drained. Plaintiff does not have any problems with concentration, and makes lists to remember things. She attends church regularly (R. 44).

**Medical Evidence Considered at the Original Hearing (June 25, 2004)**

Reports of Treating Physicians and Psychiatrists at Original Hearing

Plaintiff treated at Trinitas Hospital between July, 2002 and November, 2003 for hypertension and evaluation of her thyroid goiter. An ultrasound on May 13, 2003 revealed a 3 cm goiter on Plaintiff's thyroid (R. 182). The term "goiter" refers to the abnormal enlargement of the thyroid gland. It is important to know that the presence of a goiter does not necessarily mean that the thyroid gland is malfunctioning. A goiter can occur in a gland that is producing too much hormone (hyperthyroidism), too little hormone (hypothyroidism), or the correct amount of hormone (euthyroidism). A goiter indicates there is a condition present which is causing the thyroid to grow abnormally[2]. On June 6, 2003, aspiration of cells from her goiter were sent for evaluation. The cytology report was negative for malignant cells (R. 167, 174, 175, 176). On June 24, 2003 the Trinitas surgical department recommended that Plaintiff be treated medically for her goiter, and if that failed, surgery would be considered ( R. 179, 235). The Endocrinology Department noted that Plaintiff refused surgery, and that there was no medication that could be prescribed. In short, Plaintiff declined the hospital's advice (R. 164). On July 22, 2003, Plaintiff had an EKG which revealed bracycardia (irregular heart beat) and an echocardiogram revealed mitral regurgitation with preserved ventricular function (R. 234, 253). An exercise stress test was recommended, but Plaintiff refused. In September, 2003 treatment notes indicate that Plaintiff was feeling tired and had been having precordial chest pain for two to three months with slight sweating all day, without dysphagia or dyspnea. Her blood pressure was normal, and her thyroid was enlarged 5 cm to 25 cm. (R. 217)

---

[2]http://www.thyroid.org/patients/patient_brochures/goiter.html

4

In March, 2004 Plaintiff was examined at Trinitas Hospital for another cardiac consultation. At that time, Plaintiff had not experienced chest pains for about nine months (July 18, 2003) (R. 234). She refused a stress test during the visit (R. 234).

Plaintiff was seen by Trish Badishian, MSW, LSW at Trinitas Hospital Department of Behavioral Health and Psychiatry on December 12, 2002 for an Intake Assessment (R. 242 -251). Plaintiff reported tiredness, anhedonia, some dizziness, and grieved the loss of her mother. The mental status examination found Plaintiff to be (a) cooperative and calm; (b) her speech was normal; (c) her thought process was "circumstantial" without delusions and extremely religious in nature; (d) she was fully oriented and had no impairment in self perception; (e) her memory was intact; (f) intelligence was above average; (g) motivation for treatment was good; (h) coping skills were mildly impaired; (i) interpersonal skills were moderately impaired; and (j) she had moderately impaired functioning skills and overall fair support systems with good resources to support treatment (R. 250). Plaintiff reported that she was not working due to caring for her mother. Plaintiff's diagnosis was adjustment disorder and depressed mood with a Global Assessment of Functioning (GAF) of 55,[3] and was referred to psychiatrist Stephen Grelecki, MD. Dr. Grelecki reported a GAF of 50 and recommended individual therapy (R. 35, 241). On January 14, 2003 treatment notes indicate that Plaintiff's mood had improved since the last session and that she had been gaining acceptance of mother's death. Moreover, on February 4, 2003 treatment notes indicate that Plaintiff was feeling

---

[3] The Global Assessment of Functioning (GAF) is a numeric scale (0 through 100) used by mental health clinicians and physicians to subjectively rate the social, occupational and psychological functioning of adults, e.g., how well or adaptively one is meeting various problems-in-living. It is found in the Diagnostic and Statistical Manual of Mental Disorders (DSM), published by the American Psychiatric Association. A GAF of 51-60 indicates moderate symptoms OR any moderate difficulty in social, occupational, or school functioning.

well and stated that she did not need further psychotherapy (R 240). In April, 2003, Plaintiff communicated same to her treating physicians (R. 202, 236).

### Reports of Consultative Physicians and Psychiatrists at Original Hearing

Plaintiff was seen by Lewis Saperstein, M.D. for an internal medicine consultative examination on January 21, 2003.    At the time of the examination, Plaintiff complained of exhaustion and fatigue. She reported that her doctor found her to have hypothyroidism and a goiter. In addition, she was grieving her mother's death and had been seeing a therapist. She had recently been diagnosed with high blood pressure. Her blood pressure was high (140/89) (R. 137).

On examination, she was not in acute distress. Her gait was normal and she could walk on heels and toes without difficulty, and squat fully. She had a normal stance and used no assistive devices. At the time she could change clothes without assistance for the exam, and did not need help climbing onto the examination table. She could rise from the chair without difficulty (R. 138). Dr. Saperstein found that she was essentially normal. She had full flexion, extension, lateral flexion and full rotary movement of the cervical spine and lumbar spine (R. 138). She had full range of motion of the shoulders, elbows, forearms, and wrists bilaterally; as well as in her knees and ankles. Her strength was good (5/5) in upper and lower extremities. Her joints were stable and nontender, with no redness, heat, swelling or effusion. There was no cyansis, clubbing or edema of the extremities (R. 139). Hand and finger dexterity were intact and grip strength was good (5/5) bilaterally.

### Physical Residual Functional Capacity Assessment  (R. 141)

The Physical Residual Functional Capacity Assessment dated February 5, 2003 found Plaintiff could occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk (with normal breaks for a total of about six hours in a 8 hour workday; sit (with normal

6

breaks) for a total of about six hours in a 8 hour workday; push and/or pull (including operation of hand and/or foot controls) unlimited. There were no postural, manipulative, visual, communicative or environmental limitations (R. 143).

Plaintiff was seen by R.C. Patel, M.D. on behalf of State of New Jersey, Division of Disability Determination on August 22, 2003 for a physical examination (R 210-212). At the time, Plaintiff complained that she sometimes feels dizzy when her blood pressure is high (once a week). She complained of fatigue daily, and left precordial chest pain every few days (R. 210). She had a heart valve problem. Her prescription for that ailment was Atenolol[4] 50 mg and Altace 10 mg daily[5]. On physical examination, Plaintiff was 4' 11" weighing approximately 160 pounds. She had 20/25 vision, walked with a normal gait and without devices. According to Dr. Patel, other than the thyroid goiter, the examination was unremarkable.

On August 26, 2003 Plaintiff was seen by Vasudev Makhija, M.D for a consultative psychological examination. At that time, Plaintiff complained of depressed mood, anxiety and extreme fatigue. Plaintiff stated that about a year ago (three days after her mother passed away) she awoke feeling extremely tired, could not breath, and felt exhausted and depressed. She stated that her thyroid and heart condition cause same, and that she was discouraged about always being tired. In addition to her depression, she is nervous, upset and overwhelmed easily (R. 214).

During this mental status examination, Plaintiff began crying when she spoke of her mother's death. Her mood was anxious. She spoke fast and loud. She was alert to time, place and person; but

---

[4]Atenolol is used to treat angina (chest pain) and hypertension (high blood pressure).

[5]Altace (ramipril)is used to treat high blood pressure, heart failure, and to improve survival after a heart attack.

her intelligence was found to be borderline to below average intelligence (R. 215). The psychologist found her to be depressed; and possibly mentally retarded (although that finding was to be confirmed with psychological testing) (R. 216).

The psychiatric review technique found Plaintiff to be mildly limited in maintaining social functioning, concentration, persistence and pace but had no episodes of decompensation (R. 230).

## Evidence Considered at the Remand Hearing (October 5, 2006)

### Reports of Treating Physicians and Psychiatrists at Remand Hearing

Plaintiff was seen for a second time R.C. Patel, M.D. on May 17, 2006 as part of the Remand Hearing (R. 306). At the time of this exam, Plaintiff suffered from hypertension for which she was prescribed Toprol XL 50 and Lotrel 5/10 mg tablets daily. Her blood pressure was 160/80. As her blood pressure rises, she feels tired and sleepy nearly everyday; and experiences precorxial chest which she described as "sharp pains which lasts half a day" about twice a week. On exam, Plaintiff had a thyroid goiter but was not receiving any treatment for it. She also complained of a bout of depression monthly for the past four years. She is depressed when she is tired (R. 306). On examination Plaintiff denied dizziness, fainting, asthma and hemoptysis. Her chest pains were without palpitations or orthopnea. She denied gastrointestinal problems, but had gained approximately 20 pounds in the previous year. She was not in any acute distress and walked without assistive device. Eyes, ears nose and throat examination was unremarkable. Her lungs were normal and her heart had regular sinus rhythms without murmur or gallop. Abdomen and bowels were normal. There was no swelling in the joints of the hands and grip strength was normal. Shoulder elevation was 140 degrees bilaterally. Hip flexion was 90 degrees bilaterally; knee joint flexion was 140 degrees bilaterally ( R. 307). The laboratory data revealed a normal EKG and heart size and a

8

normal chest x-ray. Dr. Patel diagnosed hypertension; atypical chest pain; history of thyroid goiter; and anxiety and depression syndrome (R. 308).

The Medical Source Statement of Ability to do Work Related Activities (Physical) dated May 15, 2006 found Plaintiff had no limitations in lifting/carrying; standing and/or walking; sitting; or pushing and/or pulling. She was found to be frequently able to climb, balance, kneel, crouch, crawl and stoop. Her manipulative functions were unlimited and she could reach, handle, and do tasks that require fingering and feeling frequently. She had no limitations in her visual/communicative functions. There were no environmental limitations (R. 314).

On June 14, 2006 Ernesto Perdermo, Ph.D. evaluated Plaintiff. At the time of the evaluation, Plaintiff denied any history of psychiatric treatment and was not on any kind of psychotropic medications (R. 322). The mental status evaluation found Plaintiff to be oriented to time place and person (R. 323). Thought processes were organized and focused, and she spoke coherently and relevantly. There was no evidence of a thought disorder. Her mood and affect were remarkable, full and appropriate for the evaluation session. She denied symptoms of depression or anxiety, but felt frustrated because she can not work. Her short term memory was fair and her long term memory was good. Concentration was fair and intelligence appeared to be within the low average range. Plaintiff had little, if any, psychiatric problems.

On July 17, 2006, the Plaintiff underwent a Intellectual Assessment on July 17, 2006 in order to further define her disability. Again, the evaluation was conducted by Ernesto Perdermo, Ph.D. He found that Plaintiff's thought process were organized and focused and there was no indication of thought disorder or psychoses. Her mood was unremarkable. She denied symptoms of depression and/or anxiety and there was no evidence of symptomology for depression. Plaintiff had a verbal

IQ of 79 which is borderline and placed her in the 8th percentile rank. She scored a performance IQ of 80 which is low average (9th percentile rank of the population). Overall she was found to be in the borderline to low average range of intellectual functioning (R. 317). Plaintiff had no visual or hearing impairments which would affect her scores and she was social and competitive.

The Medical Source Statement of Ability to Do Work-Related Activities (Mental) of June 16, 2006 found that based upon the comprehensive psychiatric-psychological examination, claimant had no significant mental or cognitive impairment and found no mental limitations (R. 318-320, 325-327).

Establishing a Disability Under the Act

A claimant is considered disabled under the Act if he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §° 423(d)(1)(A). A Plaintiff will not be considered disabled unless he cannot perform his previous work and is unable, in light of his age, education, and work experience, to engage in any other form of substantial gainful activity existing in the national economy. *Id.* at § 423(d)(2)(A). *See Sykes*, 228 F.3d. at 262; *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 118 (3d Cir. 2000); *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). The Act requires an individualized determination of each Plaintiff's disability based on evidence adduced at a hearing. *Sykes*, 228 F.3d at 263 (citing *Heckler v. Campbell*, 461 U.S. 458, 467 (1983)); *see* 42 U.S.C. § 405(b). The Act also grants authority to the Social Security Administration to enact regulations implementing these provisions. *See Heckler*, 461 U.S. at 466; *Sykes*, 228 F. 3d at 262.

The Social Security Administration has developed a five-step process set forth in the Code

10

of Federal Regulations for evaluating the legitimacy of a claimant's disability. 20 C.F.R. § 404.1520.

First, the Plaintiff must establish that he is not currently engaging in substantial gainful activity. 20

C.F.R. § 404.1520(a). If the claimant is engaged in substantial gainful activity, the claim for

disability benefits will be denied. *See Plummer*, 186 F.3d at 428 (citing *Bowen v. Yuckert*, 482 U.S.

137, 140 (1987)). In step two, if the claimant is not working, he must establish that he suffers from

a severe impairment. 20 C.F.R. § 404.1520(c). If the claimant fails to demonstrate a severe

impairment, the ALJ must deny disability benefits. *Id.*

If the claimant suffers a severe impairment, step three requires the ALJ to determine, based

on the medical evidence, whether the impairment matches or is equivalent to a listed impairment

found in "Listing of Impairments" located in 20 C.F.R. § 404, Subpart P, Appendix 1. *Id.*; *Burnett*,

220 F.3d at 118-20. If it does, the claimant is automatically disabled. 20 C.F.R. § 404.1520(e). The

Third Circuit has required that in determining whether the claimant's impairments meet or equal any

of the listed impairments, an ALJ must identify relevant listed impairments, discuss the evidence,

and explain his reasoning. *Burnett*, 220 F.3d at 119-20. A conclusory statement of this step of the

analysis is inadequate and is "beyond meaningful judicial review." *Id.*

If the claimant does not suffer from a listed severe impairment or an equivalent, the ALJ

proceeds to steps four and five. *Plummer*, 220 F.2d at 428. In step four, the ALJ must consider

whether the claimant "retains the residual functional capacity to perform [his or] her past relevant

work." *Id.*; *see Sykes*, 228 F.3d at 263; 20 C.F.R. § 404.1520(d). This step requires the ALJ to do

three things: 1) assert specific findings of fact with regard to the claimant's residual functional

capacity ("RFC"); 2) make findings with regard to the physical and mental demands of the Plaintiff's

past relevant work; and 3) compare the RFC to the past relevant work, and based on that comparison,

11

determine whether the claimant is capable of performing the past relevant work. *Burnett*, 220 F.3d at 120. The claimant bears the burden of proof for steps one, two and four of this five-step test. *Sykes*, 228 F.3d at 263. The claimant bears the burden of proving that he is unable to return to his former type of work. *Wallace*, 722 F.2d at 1153.

If the claimant cannot perform the past work, the analysis proceeds to step five. In this final step, the burden of production shifts to the Commissioner to determine whether there is any other work in the national economy that the claimant can perform. *See* 20 C.F.R. § 404.1520(f); *Sykes*, 228 F.3d at 263 (citing *Yuckert*, 482 U.S. at 146 n.5); *Burnett*, 220 F.3d at 118-19; *Plummer*, 186 F.3d at 429; *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986). In demonstrating there is existing employment in the national economy that the claimant can perform, the ALJ can utilize the Medical-Vocational Guidelines (the "Grids") from Appendix 2 of the regulations, which consider age, physical ability, education and work experience. 20 C.F.R. § 404, Subpt. P, App.2. However, when determining the availability of jobs for claimants with exertional and non-exertional impairments, "the government cannot satisfy its burden under the Act by reference to the Grids alone," because the Grids only identify "unskilled jobs in the national economy for claimants with exertional impairments who fit the criteria of the rule at the various functional levels." *Sykes*, 228 F.3d at 269-70. Instead, the Commissioner must utilize testimony of a "vocational expert or other similar evidence, such as a learned treatise," to establish whether the claimant's non-exertional limitations diminish his residual functional capacity and ability to perform any job in the nation. *Id.* at 270-71, 273-74; *see also Burnett*, 220 F.3d at 126 ("A step five analysis can be quite fact specific, involving more than simply applying the Grids, including . . . testimony of a vocational expert"). If this evidence establishes that there is work that the claimant can perform, then he is not disabled. 20 C.F.R. § 404.1520(f).

Review of ALJ by District Court

Review of the Commissioner's final decision is limited to determining whether the findings and decision are supported by substantial evidence in the record. See *Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir. 2000); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); see 42 U.S.C. §405(g). The Court is bound by the ALJ's findings of fact if they are supported by substantial evidence in the record. 42 U.S.C. S 405(g); *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hartranft*, 181 F.3d at 360 (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation omitted)); see *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla. *Richardson*, 402 U.S. at 401; *Morales*, 225 F.3d at 316; *Plummer*, 186 F.3d at 422. Likewise, the ALJ's decision is not supported by substantial evidence where there is "competent evidence" to support the alternative and the ALJ does not "explicitly explain all the evidence" or "adequately explain his reasons for rejecting or discrediting competent evidence." *Sykes v. Apfel*, 228 F.3d 259, 266 n.9

The reviewing court must view the evidence in its totality. *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984).

> A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence - - particularly certain types of evidence (e.g., that offered by treating physicians) - - or if it really constitutes not evidence but mere conclusion.

*Morales*, 225 F.3d at 316 (citing *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.1983)); *Benton v. Bowen*, 820 F.2d 85, 88 (3d Cir. 1987). Nevertheless, the district court's review is deferential to the ALJ's factual determinations. *Williams v. Sec'y of Health and Human Servs.*, 970 F.2d 1178, 1182

(3d Cir. 1992) (en banc) (stating that the district court is not "empowered to weigh the evidence or substitute its conclusions for those of the factfinder."). A reviewing court will not set a Commissioner's decision aside even if it "would have decided the factual inquiry differently." *Hartranft*, 181 F.3d at 360. But despite the deference due the Commissioner, "appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence." *Morales*, 225 F.3d at 316 (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)).

Title II of the Social Security Act (42 U.S.C. §401, *et seq.* requires that the claimant provide objective medical evidence to substantiate and prove his or her claim of disability. *See,* 42 U.S.C. §(d)(5)(a). Therefore, claimant must prove that his or her impairment is medically determinable and cannot be deemed disabled merely by subjective complaints such as pain. A claimant's symptoms "such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect . . . .[one's] ability to do basic work activities unless "medical signs" or laboratory findings show that a medically determinable impairment(s) is present." 20 C.F.R. §404.1529(b). *Hartranft*, 181 F.3d at 362.

Remand Hearing and Decision of ALJ DeSteno

On October 5, 2006, the Remand Hearing was held before ALJ Desteno (R. 328). The period of disability to be considered was from August 9, 2002 through May 15, 2005. Plaintiff did not appear at this hearing and waived her right to testify. Plaintiff was represented by an attorney. The first witness was a vocational expert, Dr. Rocco Meola. The ALJ asked the expert about Plaintiff's ability to work. Referring to previous job as a part time worker in the bakery of a supermarket, Mr. Meola found that there were jobs (carton maker, cleaner, laundry worker) that were classified as unskilled jobs at a medium exertional level which Plaintiff could perform. There

14

are approximately 1,500 jobs of this nature in northern New Jersey, and approximately 3,000 jobs in the New York metro area and 15,000 within the State of New Jersey. Mr. Meola also considered an individual of claimant's age, education and work experience with a residual functional capacity for lifting and carrying objects weighing up to 20 pounds, frequently lifting and carrying objects weighing up to ten pounds, sit, stand and walking up to six hours in an eight hour day, pushing and pulling arm and leg controls, limited to performing simple, repetitive tasks. The expert found such jobs as garment sorter and scale operator fit this description and testified that there were thousands of such jobs available in New Jersey.

On October 17, 2006, the ALJ issued his decision that Plaintiff was not under a disability as defined in the Social Security Act at any time during the relevant time period. More specifically, he found that Plaintiff's hypothyroidism, goiter, hypertension, obesity, depression and anxiety were considered "severe," based on the requirements in the Regulations, but further found that these medically determinable impairments did not meet or medically equal any of the listed impairments in Appendix 1, Subpart P, Regulations No. 4.

Pursuant to Judge Hayden's remand order, the ALJ ordered a consultative examination for purposes of psychological cognitive and intellectual testing. The ALJ included Dr. Perdermo's June, 2006 assessment of Plaintiff in his opinion. Dr. Perdermo found Plaintiff to have a GAF of 80 in June, 2006. Dr. Perdermo further found that Plaintiff's thought process were organized and focused, there was no indication of thought disorder or psychoses, her mood was unremarkable and she denied symptoms of depression and/or anxiety and there was no evidence of symptomology for depression  (R. 317). The ALJ"s opinion also includes the results of  testing done by Plaintiff's therapist at the Adult/Geriatric Unit of Trinitas Hospital.  The conclusion of that testing was that Plaintiff was diagnosed with somatoform disorder NOS.  It was recommended that Plaintiff continue

with "talk therapy". It is important to also note that at no point does Plaintiff's treating psychiatrist note any periods of extended psychiatric decompensation or recommend inpatient therapy for Plaintiff. In fact, it appears that Plaintiff was not even taking medications for her depression at the time of that exam. Exam notes indicate that Plaintiff should be "advised how antidepressants might help improve her mood in an attempt to overcome resistence to psychotropic medications (R. 277).

Judge Hayden also instructed the ALJ to make an assessment of Plaintiff's GAF based on statements made by her treating psychiatrist. With regard to the GAF rating of 50-55 made by a therapist at Trinitas Hospital, substantial evidence supports the ALJ's decision not to give significant weight to that finding. This decision is supported by Plaintiff's own statement to her psychiatrist in February, 2003 where Plaintiff was feeling well and stated that she did not need further psychotherapy (R 240). In April, 2003 Plaintiff communicated same to her treating physicians (R. 202, 236). In addition, on June 14, 2006 Ernesto Perdermo, Ph.D. evaluated Plaintiff. At the time of the evaluation, Plaintiff denied any history of psychiatric treatment and was not on any kind of psychotropic medications (R. 322). The mental status evaluation found Plaintiff to be oriented to time place and person (R. 323). Thought processes were organized and focused, and she spoke coherently and relevantly. There was no evidence of a thought disorder. Her mood and affect were remarkable, full and appropriate for the evaluation session. She denied symptoms of depression or anxiety, but felt frustrated because she can not work.

With regard to the testimony of the vocational expert, the ALJ's decision includes a thorough recitation of the findings Mr. Meola that based on Plaintiff's residual functional capacity, Plaintiff could perform her past relevant work as a packer of baked goods at Pathmark supermarket, and that many other jobs existed in the local economy that involve no greater than simple, repetitive tasks.

Here, the finding of ALJ DeSteno were clearly set forth and there is substantial evidence that Plaintiff was not disabled between August 9, 2002 and May 15, 2005. ALJ DeSteno followed Judge Hayden's remand order and obtained the information requested. As noted earlier, Plaintiff argues that ALJ DeSteno is closed minded on remand cases. From reviewing the Original and Remand Hearings, and as summarized in this Opinion, there is substantial evidence supporting his decision.

The decision of the ALJ is affirmed. The complaint is dismissed with prejudice.

*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.

March 31, 2009

17